AO 91 (Rev. 01/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| SALEUMSAK KHAMMUNGKHUNE and | ) | Case No.  10-8129-JMH |
| DAVID JOHNSON | ) | |
| | ) | |
| _____ | | |
| *Defendant* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of  March 27, 2010  in the county of  Palm Beach  in the  Southern  District of  FL & elsewhere  , the defendant violated  18  U. S. C. §  371  , an offense described as follows:

did knowingly and willfully combine, conspire, confederate, and agree with other persons known and unknown to commit offenses against the United States, namely wire fraud, in violation of 18 USC 1343 and false impersonation of an officer, in violation of 18 USC 912; all in violation of 18 USC 371. The defendants did knowingly and willfully devise a scheme and artifice to defraud and for obtaining money and property from persons by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing the scheme and artifice to defraud, to transmit and cause to be transmitted in interstate and foreign commerce by means of wire communications, certain writings, signs, signals, pictures and sounds, in violation of 18 USC 1343 and 2. The defendants did falsely assume and pretend to be an officer and employee of the United States acting under the authority thereof and any department, agency and officer and in such assumed and pretended character with intent to defraud did falsely demand and obtain money, in violation of 18 USC 912 and 2.

This criminal complaint is based on these facts:

### SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

DONALD A. GUTHRIE, Special Agent, ICE OPR
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  5-11-10

_____
*Judge's signature*

City and state:  WEST PALM BEACH, FL

JAMES M. HOPKINS, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT

Your affiant Donald Guthrie, first being duly sworn, does hereby depose and state as follows:

1. Your affiant, Donald Guthrie, is employed as a Special Agent of the Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security. I have been with ICE (previously known as US Customs Service) for approximately twenty-five (25) years. I have been a Special Agent working within the ICE Office of Investigations for approximately five (5) years, a Marine Enforcement Officer for thirteen (13) years and a Criminal Investigator for four (4) years. Most recently, your affiant was transferred to the ICE Office of Professional Responsibility, where I have been employed for approximately three (3) years. In this capacity, your affiant is responsible for investigating both serious allegations of misconduct by ICE employees, as well as, violations of federal law by non-employees to include the impersonation of a federal agent or official employed by the U.S. Government. This affidavit does not purport to contain all the information known to your affiant regarding this case, but merely enough to satisfy the requirement of probable cause. The information contained herein is based on Affiant's experience and training as well as his personal knowledge and information supplied by other individuals.

2. In October 2008, Affiant initiated an investigation into a suspicious letter received at the U.S. Customs and Border Protection Foreign Mail Facility in Miami, Florida. The author of the letter was a seventy-seven (77) year old man from Tucson, Arizona, who was questioning the whereabouts of two packages that were allegedly

~ 1 ~

received at the facility from a foreign country. The packages were alleged to contain a large amount of U.S. money.

3.   Affiant contacted the man from Arizona, hereafter referred to as Victim 1, concerning his inquiry. Victim 1 advised Affiant that he had been notified over the Internet that he had been the recipient of approximately $10.5 million. The money was allegedly shipped from Nigeria to the United States, arriving at the Foreign Mail Facility, Miami, Florida. Victim 1 said that he had been making duty payments to persons identifying themselves as U.S. Customs Officers Michael Philips and James Campbell, in an effort to receive his packages.

4.   Victim 1 also told Affiant that he had been directed by these officers to fly to Washington D.C. to meet them and pay additional fees to receive the packages. Victim 1 told Affiant that he had traveled to the Hilton Crystal City Hotel, in Arlington, Virginia, where he had met with someone he believed was either Michael PHILIPS or James CAMPBELL, and who identified himself as a U.S. Customs Officer. Victim 1 told Affiant that he gave the purported Customs Officer a bag of money representing additional fees.  Victim 1 could not remember how much money he relinquished.

5.   Victim 1 described the person he met as a black male in his mid-thirties. Victim 1 told Affiant that the "officer" departed the hotel with the bag of money, advising Victim 1 that the other Customs Officer would return with the packages, alleged to contain the $10.5 million. Victim 1 said that he waited and the other officer never came with the packages. Victim 1 told Affiant that he returned to Arizona the next day.

6.   On December 17, 2008, Affiant arrived at the Hilton Crystal City, Arlington, Virginia, and verified the stay of Victim 1 on October 15, 2008.

~ 2 ~

7. Affiant has queried the U.S. Department of Homeland Security employee databases for the names of Michael PHILIPS or James CAMPBELL. They were negative for any employees assigned to the Virginia or District of Columbia area.

8. On February 19, 2009, Affiant proceeded to an Arizona nursing home where Victim 1 was in residence. With permission, Affiant downloaded numerous e-mails that had been sent to Victim 1. Affiant observed that many of the messages pertained to the packages alleged to contain 10.5 million dollars which were reportedly held by U.S. Customs officials. Affiant downloaded pictures showing two large trunks containing money, allegedly awaiting delivery to Victim 1, as well as a picture of an official U.S. Customs and Border Protection Badge that had been e-mailed to Victim 1.

9. Affiant also recovered receipts of wire transfers and bank counter deposits, made by Victim 1 in connection with this scheme totaling more than $109,000.00. At least one of the wire transfers in connection with the scheme was sent to an Hispanic male in Miami, Florida.

10. With permission of Victim 1, Affiant replied to three of the then most recent e-mails which requested additional fees or duties. One of those responses was directed to the USCUSTOMSDEPT@UBBI.com. This is not an official Customs site. On February 23, 2009, Affiant observed that the above email address had responded requesting an additional $8,760.00 in fees from Victim 1 to receive the packages.

11. On March 2, 2009, Affiant opened an undercover Internet account at the ICE OPR Plantation Office, assuming the identity of Victim 1.

12. Affiant has been posing as Victim 1 on the internet for approximately the past year. Affiant has advised the subjects that he had relocated to Palm Beach County,

~ 3 ~

Florida, where he had been diagnosed with cancer. Affiant also said that he was no longer willing to wire or send any additional money and could not risk losing the money due to high medical costs. Affiant advised the subjects that they would have to come to Palm Beach County, Florida to receive the $8,760.00.

13.  Various e-mails had directed Victim 1 to send or deposit money into identified account numbers. Affiant was able to identify the account holders associated with the bank accounts. Some of these accounts had previously been used to funnel illicit proceeds of this scheme.

14.  On June 16, 2009, the solicitations requesting that the $8,760.00 be sent to receive the two packages alleged to contain the 10.5 million dollars continued under a new e-mail address of robertbonner@cox.net. The e-mails are signed "Mr. Robert Boner" or "Mr. Boner." In these e-mails Boner is spelled with one "n" despite the e-mail address having two letter "n"'s in "bonner".

15.  The U.S. Customs Service was previously headed by Mr. Robert Bonner. Commissioner Bonner held that position for approximately four years, until he retired in November 2005.

16.  Affiant has enlisted the assistance of an older, retired U.S. Customs Special Agent to pose as Victim 1 during several covertly recorded conversations with "Mr. BONER." Affiant has observed that the telephone conversations are with persons who speak with a strong accent. Affiant has heard the ex-Commissioner of the U.S. Customs Service speak, but never having this type of accent.

17.  Affiant has also observed that based on the voice tones and words used from the suspects he has overheard claiming to be Robert BONER, several different persons

~ 4 ~

may be posing as BONER. Affiant has learned from other law enforcement personnel, with significant experience in the area of Nigerian based schemes, that it is common practice for multiple persons to assume one identity. Affiant has learned that these organizations are known to have "Victim Lists", where co-conspirators in the "boiler room" type operations update themselves on the particulars of each victim.

18. In an e-mail sent to the undercover account on May 18, 2009, BONER wrote, "Please do not compare me with James Campbell or Michael Philips because both of them are junior officers and it was because of their fraudulent activities that they were dismissed from work." BONER further wrote, "I, with my position as a high ranking officer of the U.S. Customs, I will never get myself involved in any scam....." BONER has advised Affiant that Officers Campbell and PHILIPS have been arrested for their fraudulent activities and are pending prosecution for fraud and bribery offenses.

19. On June 22, 2009, a message was left on the undercover telephone of Victim 1. The caller stated that he was "SOLOMON LEWIS," who had been directed to call the victim about delivery of his packages. During the return call by the undercover, Mr. LEWIS requested that victim 1 send $3,000, via Western Union, to his attention in New York City, and the packages would be delivered. Mr. LEWIS terminated the call when he was told that he would have to come to pick-up the money. The telephone number is connected with a throw-away prepaid telephone with no listed subscriber.

20. In a subsequent e-mail sent by BONER to the undercover account, BONER advised that LEWIS was on assignment and another representative, defendant SALEUMSAK KHAMMUNGKHUNE, would assist in the receipt of payment and delivery of the packages.

~ 5 ~

21.   Over the past six months, Affiant has been communicating with defendant SALEUMSAK KHAMMUNGKHUNE by negotiating required fees and other incidentals relating to the attempt to procure the packages. Affiant has recorded several telephone calls between defendant KHAMMUNGKHUNE, who is in San Diego, California, and the undercover U.S. Customs Agent, in Broward County, Florida, posing as Victim 1 from Palm Beach.

22.   During e-mails and conversation, Affiant has portrayed Victim 1 in failing health; cancer which has spread and eleven brain tumors.   Affiant has also said that Victim 1 is down to his last $10,000, money that he could not risk losing due to the chemotherapy and radiation treatments.   Defendant SALEUMSAK KHAMMUNGKHUNE nonetheless has offered to travel to Palm Beach County, Florida to pick up approximately $8,640.00 in fees for the packages directly from Victim 1.

23.   Affiant had provided a secret password in e-mails to BONER, who has in turn relayed this password to defendant KHAMMUNGKHUNE.   In most of the subsequent e-mails or telephone calls with defendant KHAMMUNGKHUNE, the defendant has utilized this password.

24.   Affiant has observed that e-mails from defendant KHAMMUNGKHUNE have described BONER as an influential U.S. Customs official, someone to emulate, who is well respected by officials of other countries.

25.   In a January 13, 2010 e-mail from KHAMMUNGKHUNE,  the defendant states that he wishes Victim 1 a quick recovery from cancer surgery, "...as there is a lot of money waiting for you to enjoy." KHAMMUNGKHUNE also stated, "your two packages contain your wealth to the tune of $10.5 million USD...The person who has

~ 6 ~

the key to unlock this wealth is Mr. Robert Boner." KHAMMUNGKHUNE continued to state, "Mr. Boner is an employee of the U.S. Customs Dept. but he is not just an ordinary employee to this department...part of his responsibility in the International arena is to facilitate the delivery of valuable affects that belong to foreign beneficiaries residing in the U.S. based on the mandates agreed by the high echelons from African Nations and European countries...He is looking after the American interests in these regions and that he has to be fair to all sides to make it work...as one Turkish Official remarked that, Mr. Boner is a good and fair man."

26.  Affiant on January 19, 2010, downloaded several voice mail messages from the undercover telephone of Victim 1, all from KHAMMUNGKHUNE. In one message the defendant appeared to confuse Victim 1's telephone number with another potential victim, hereafter referred to as Victim 2, also from Arizona. In that e-mail, Affiant noted that KHAMMUNGKHUNE appeared to be advising Victim 2 that he had an airplane ticket and was preparing to fly to his location.

27.  On February 4, 2010, Victim 2 was located in Arizona. On February 7, 2010, Affiant arrived at the residence of Victim 2, a disabled veteran of the first Gulf War suffering from severe migraine headaches and Fibromyalgia.

28.  Victim 2, in a fashion similar to Victim 1, had been solicited over the Internet, and had received e-mails depicting a photograph of several large packages alleged to contain $10,000,000, which had arrived at the U.S. Customs and Border Protection facility in San Francisco, California, awaiting his pick-up. Victim 2 told Affiant that he had paid between $170,000 and $200,000 to KHAMMUNGKHUNE from San Diego, California, Robert Boner of US Customs and others.

~ 7 ~

29. Victim 2 also told affiant that he had been directed by BONER, purportedly a high ranking U.S. Customs official, to purchase airfare for defendant KHAMMUNGKHUNE to travel to Arizona to pick-up approximately $10,000 in additional fees. Affiant said that Victim 2 complied, and on November 8, 2009, Victim 2 met with defendant SALEUMSAK KHAMMUNGKHUNE at the local airport, handing over the requested fees of approximately $10,000.00.

30. Affiant also learned that prior to the meeting at the airport, SALEUMSAK KHAMMUNGKHUNE had scanned and e-mailed a copy of his Driver's License and U.S. Passport to Victim 2 to assist in his identification at the airport. Affiant recognized the suspect as the same subject he had previously identified during the course of the investigation involving Victim 1.

31. Victim 2 has advised your affiant that he had been taking various medications for his medical condition, which he believed rendered him susceptible to the imposters. Affiant learned that Victim 2 had traveled to San Francisco, California in an effort to obtain the packages containing the $10,000,000. Victim 2 advised Affiant that he had proceeded to the U.S. Customs & Border Protection Office in San Francisco, where the officers advised that they had no packages for Victim 2. Affiant has verified this travel.

32. Affiant was provided with several documents in furtherance of this scam which were e-mailed to Victim 2. Affiant observed these items to be quite elaborate in appearance. The documents included what purported to be a receipt for payment from the U.S. Customs and Border Protection. Other documents appeared to be from Homeland Security, Immigration and Border Protection Unit, and the U.S. Department of State/Internal Revenue Service [sic]. Affiant observed that two of the documents

~ 8 ~

displayed the name "Mrs. Janet Ann Napolitano, secretary [sic], Department of Homeland Security", along with the official seal of the U.S. Department of Homeland Security. One of the documents had the photograph of "Mrs. Condoleezza Rice," her "signature," and identified her as being of the IRS Financial service dept.

33. Victim 2 has advised Affiant that BONER told Victim 2 that the packages containing the money had been relocated to another part of California, and defendant SALEUMSAK KHAMMUNGKHUNE would assist in the delivery.

34. Affiant learned from Victim 2 that after the payment of the $10,000 in fees to defendant KHAMMUNGKHUNE, he was contacted by e-mail by BONER and told that an additional $6,400.00 was required to be paid to KHAMMUNGKHUNE. Victim 2 then wired the $6,400.00, from Arizona, to defendant KHAMMUNGKHUNE'S bank account in California. According to bank records, the day after the $6,400.00 wire transfer was completed defendant KHAMMUNGKHUNE withdrew the entire amount in cash.

35. On February 8, 2010, Affiant recorded a telephone conversation in which KHAMMUNGKHUNE stated that he had provided the $10,000 to BONER. The defendant said that he was sorry for the previous losses of Victim 2, but Victim 2 would have to contact BONER directly or a person in Turkey, who is more closely associated with BONER than KHAMMUNGKHUNE. Victim 2 then said to KHAMMUNGKHUNE that the entire episode regarding the $10,000,000 was obviously a scam; the packages were never delivered. In response, defendant KHAMMUNGKHUNE said that he did not know that and they had lied to him also. He said that he, the defendant, should stop working with these people, it is not worth it.

~ 9 ~

36.     Within approximately twelve hours after the above conversation, Victim 1
received an e-mail from defendant KHAMMUNGKHUNE asking if Victim 1 had
purchased airline tickets for KHAMMUNGKHUNE'S travel to Palm Beach so that he
could receive fees from Victim 1 for the packages.

37.     In a recorded telephone call between Victim 2 and BONER, at the
telephone number previously provided by KHAMMUNGKHUNE, BONER confirmed that
he had received the $10,000 payment from KHAMMUNGKHUNE.  BONER then told
Victim 2 that he now owed an additional $16,000 to obtain his packages. BONER was
advised by Victim 2 that he would only provide that money directly to BONER. Victim 2
authorized Affiant to assume his identity on the Internet.

38.     Posing as Victim 2, Affiant communicated with BONER from the e-mail
account of Victim 2.  Affiant agreed to meet BONER in person.  Affiant had suggested a
meeting in Orlando, Florida.  On March 10, 2010, BONER e-mailed Victim 2 and stated
that he, BONER, had too many official engagements and could not travel to Orlando.
He also stated that they could meet in Washington, D.C.  On March 16, 2010, BONER
told Victim 2 that he should fly into BWI or Reagan  Airports, and stay at the Marriott
hotel in Greenbelt, Md.  The meeting was set for March 25, 2010 in Greenbelt, Md.

39.  On March 19, 2010 Affiant received an e-mail from KHAMMUNGKHUNE  on
the e-mail account of Victim 1 with instructions for a meeting in West Palm Beach on
March 27, 2010 in order to pay the requested $8,640.00 in fees.  KHAMMUNGKHUNE
requested Victim 1 purchase a roundtrip airline ticket for a flight leaving San Diego,
California on Friday March 26, 2010 after 7PM and arriving in West Palm Beach the

~ 10 ~

morning of Saturday March 27, 2010.  KHAMMUNGKHUNE had previously requested that Victim 1 also obtain a hotel room in West Palm Beach for him.

40.  On March 23, 2010 Affiant went to Palm Beach International Airport (PBIA) and purchased roundtrip air passage on JetBlue for KHAMMUNGKHUNE; the flight departing San Diego, California on March 26, 2010 and arriving in West Palm Beach in the morning of March 27, 2010.  Affiant also went to the Best Western hotel in West Palm Beach, near PBIA, and paid for a hotel room for the night of March 27, 2010 in the name of KHAMMUNGKHUNE.  Affiant e-mailed the flight itinerary to the defendant KHAMMUNGKHUNE and told him that Victim 1 will be at the airport to meet him. Affiant told him that Victim 1 will be recognizable; a man with a walker holding a sign .

41.  On March 23, 2010 Affiant e-mailed BONER advising him that there was a delay but would meet BONER at noon Friday.

42.  On March 24, 2010 Affiant, as Victim 2, received an e-mail from Robert BONER stating that due to the one day delay, there would be additional storage fees required and that a DAVID JOHNSON would be contacting him.

43.  On March 24, 2010 Affiant received a telephone call from a person identifying himself as DAVID JOHNSON.   The call had a phone number with a (202) area code.  Defendant JOHNSON stated that if the deal could not be consummated on March 25, 2010, there would be an additional $1000 fee which had to be sent to him (JOHNSON).  Affiant stated that he would make the meeting on March 25, 2010.  Affiant then asked if BONNER was going to be there.  Defendant JOHNSON said they both would be at the meeting.  Defendant JOHNSON also stated that he worked with Mr.

BONER at Customs and that he is BONER'S assistant who takes care of things when BONER is gone.

44.    On March 26, 2010, at the Marriott in Greenbelt, Maryland, defendant DAVID JOHNSON, identifying himself as a US Customs official met with Affiant  who was posing, in an undercover capacity, as Victim 2.

45.    Defendant JOHNSON acknowledged that he was the assistant to ROBERT BONER, and stated that he was there to assist in the delivery of the packages. Defendant JOHNSON stated that he would take the fees and go to get the packages. Defendant JOHNSON offered to take Affiant with him, to go get the packages. When Affiant did not agree,   Defendant JOHNSON offered to go get his Identification from his motor vehicle parked outside. Defendant returned without any Identification.

46.    Defendant JOHNSON agreed to a later meeting with Affiant, where JOHNSON said he would be accompanied by BONER. Defendant JOHNSON departed the room without the fees. The meeting was videotaped.

47.     After Defendant JOHNSON departed the room, BONER called on the telephone of Victim 2.  BONER was angry that Affiant did not relinquish the $16,000.00 in fees to Defendant JOHNSON, and told Affiant to return to Arizona.

47.    On March 27, 2010, defendant SALEUMSAK KHAMMUNGKHUNE arrived at the Palm Beach International Airport to pick-up $8,640.00 in U.S. Customs fees from Victim 1. The retired U.S. Customs Agent, posing as Victim 1, met with KHAMMUNGKHUNE at the concourse.   The undercover had a walker and another agent, dressed in "scrubs," was posing as a nurse, and standing near-by.

~ 12 ~

48. The undercover asked KHAMMUNGKHUNE if he had brought the packages with him containing the $10.5 million. KHAMMUNGKHUNE said that he was there to pick-up the fees to send to BONER, to enable the release of the packages. KHAMMUNGKHUNE was told that the fees had already been deposited in a Bank of America bank account, as directed over the Internet by another subject. Defendant KHAMMUNGKHUNE wanted to know who had advised Victim 1 to do that, and the agent replied, Mr. LORENZO.

49. KHAMMUNGKHUNE was very upset with this revelation and asked if Victim 1 could provide at least $1,000.00 or $2,000.00. When told he was getting no additional money, KHAMMUNGKHUNE stated, referring to himself, "I'm a dead man." KHAMMUNGKHUNE returned to San Diego, California the next day.

50. Subsequent e-mails to Victim 1 from BONER have requested a new total in fees; $13,360.00. An e-mail dated April 30, 2010 from BONER to Victim 1 requested that the fees be wired into the bank account of KHAMMUNGKHUNE, in San Diego, California. Affiant knows the identified account to be the account of defendant KHAMMUNGKHUNE. Affiant declined, stating that another meeting would be possible.

51. On May 9, 2010, BONER called the telephone of Victim 2. Affiant spoke with BONER, advising that he would pay the Customs fees to Defendant JOHNSON, but had been unsuccessful in contacting him. BONER advised Affiant that JOHNSON was in a meeting and he would get him to call. Affiant recognized BONER as the BONER Affiant has spoken to most of the time.

52. Approximately two hours after the conversation with BONER, Affiant received a call from Defendant JOHNSON. Affiant asked if he could meet with

~ 13 ~

JOHNSON in the Washington D.C. area to turn over the requested fees. Defendant JOHNSON said that he was in a meeting with the "High Commissioner", and would call back (Victim 2) the following morning.

53. On May 10, 2010, Defendant JOHNSON called Victim 2, advising that a meeting would be possible. He asked if Victim 2 could send $1,000.00 or $2,000.00 prior to the meeting. Affiant said that this was not possible since Victim 2 was already en route from Arizona via motor vehicle. A meeting was agreed upon for May 13, 2010 at the Marriot hotel, Greenbelt, Maryland, where Victim 2 had previously met Defendant JOHNSON.

54. On May 10, 2010, Affiant purchased an airplane ticket for defendant KHAMMUNGKHUNE, as requested by BONER, for KHAMMUNGKHUNE's travel from San Diego to West Palm Beach to pick-up $13,360.00 in fees.

55. Based upon the foregoing, there is probable cause to believe that the defendants have committed violations of Title 18, United States Code, Section 371 (conspiracy to commit wire fraud and impersonation of an officer/employee of the United States); Title 18, United States Code, Section 1343 (wire fraud); Title 18, United States Code, Section 912 (impersonation of an officer/employee of the United States) and

Title 18, United States Code, Section 2.

FURTHER YOUR AFFIANT SAYETH NAUGHT

DONALD A. GUTHRIE
Senior Special Agent
Immigration and Customs Enforcement
Office of Professional Responsibility

SUBSCRIBED TO AND SWORN BEFORE ME
THIS ___ / / ___ DAY OF
AT WEST PALM BEACH, FLORIDA.

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

~ 15 ~